# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

| | | |
|---|---|---|
| **LATHROP R-II SCHOOL DISTRICT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08-6040-CV-SJ-GAF** |
| | ) | |
| **WILLIAM GRAY, by and on behalf** | ) | |
| **of his son, D.G.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Presently before the Court are Plaintiff and Counterclaim-Defendant Lathrop R-II School District's (the "District") Motion for Summary Judgment or, in the Alternative, for Judgment on the Administrative Record and its Motion for Judgment on the Pleadings with Respect to the Amended Counterclaim pursuant to Fed. R. Civ. P. 12(c). (Doc. ##51, 47). The District argues the findings of the Administrative Hearing Panel (the "Panel") and the relief ordered after a hearing brought under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 140 *et seq.*, were legally erroneous and not supported by substantial evidence in the record. *Id.* It further asserts the counterclaims against it should be dismissed for failure to state a claim. *Id.* Defendant and Counterclaim-Plaintiff William Gray, by and on behalf of his son, D.G., ("Mr. Gray" or "Defendant") opposes both Motions. (Doc. ##54, 57, 61). For the reasons set forth below, the District's Motions are **GRANTED**.[1]

---

[1] Defendant's Motion for Judgment on the Administrative Record (Doc. #49) is **DENIED** as moot.

-1-

## I.      FACTS

### A.      Prior to the 2002-2003 School Year.

D.G. is a student with a disability for purposes of the IDEA and the Missouri State Plan for Part B of the IDEA. (Hearing Panel's Decision on Remand, Findings of Fact ("RFF"), p. 7).  At all relevant times, D.G. was educationally diagnosed as autistic. *Id.*  Around October 20, 2000, D.G. transferred from the Putnam County School District to the District. (RFF, p. 7; Respondent's Hearing Exhibit ("Ex. R-[Number of Exhibit]") R-1, pg. 1-2).  As a result and before he had begun attending school at the District, the District's Special Education Director, Dr. Ken Quick ("Dr. Quick") and other staff members enrolled in Project Access training in autism to prepare for D.G.'s arrival. (RFF, p. 9; Hearing Transcript (hereafter "Tr.") 561, 577-78, 594, 1632, 2024-26).   The District also hired Katie Alexander ("Ms. Alexander"), an occupational therapist who provided therapy services to children with autism, to provide occupational therapy services to D.G.[2]  (Tr. 1674, 2989, 3017, 3017-18).  Ms. Alexander was employed in this capacity from August of 2000 through the Fall of 2002.  (Tr. 3018).

Upon his arrival, the District placed D.G. in an interim regular fourth grade class until a new Individualized Education Plan[3] ("IEP") was developed. (Tr. 96, 1223, 1636-38).  During this time, his special education teacher, Cindy Nance ("Ms. Nance") noticed that D.G. exhibited many

---

[2]Ms. Alexander, at the time of the hearing, had a bachelor's degree in occupational therapy and had begun a master's program in that area. (RFF, p. 10).  She also held a Missouri license to provide occupational therapy and was board certified. *Id.*

[3]Under the IDEA, a school district must summarize the services it will provide to each student in a written statement called an Individualized Education Plain.  *Dohmen ex rel Dohmen v. Twin Rivers Pub. Sch.*, 207 F. Supp. 2d 972, 976 (D. Neb. 2002).

-2-

disruptive behaviors, such as loud outbursts, finger biting, echolalia, talking, and reciting.[4] (Tr. 1631, 1679-80). These behaviors impeded his learning. (RFF, p. 10).

On November 13, 2000, D.G.'s IEP team convened to prepare his IEP. (RFF, p. 10; Ex. R-1). This IEP contained statements of D.G.'s present level of educational performance, noted his behavioral problems, and listed educational goals. *Id.* In the Spring and Fall of 2001, D.G. began displaying behavior that was perceived as sexual. (RFF, p.11). Ms. Alexander initiated strategies to assist D.G. in replacing these behaviors with more appropriate ones. *Id.* On November 7, 2001, the IEP team convened to conduct the annual review of D.G.'s IEP. (Ex. R-2; RFF, p. 11). The present level section of the IEP noted D.G.'s progress, and some of D.G.'s behavioral problems were listed as having decreased. *Id.* Under this IEP, D.G. remained in the special education classroom for more that sixty (60) percent of the time. (RFF, p. 12; Ex. R-2, p. 28).

On April 5, 2002, Dr. Quick wrote a letter to D.G.'s parents about an upcoming IEP meeting, which described the District's desire to bring in a behavioral/autism specialist to consult with the IEP team. (RFF, p. 13; Ex. R-2, p. 55). Prior to this time, Ms. Alexander had informally consulted with Marilyn Stubbs ("Ms. Stubbs"), who specialized in persons with disabilities and autism in particular, about D.G.'s behaviors. (RFF, p. 13; Tr. 398-99, 732-34, 847). Thereafter, the District hired Ms. Stubbs to conduct a functional behavior assessment ("FBA") of D.G. (RFF, p. 14; Tr. 737). The purpose of the FBA was to analyze D.G.'s sexual behaviors and suggest strategies to reduce those behaviors. (RFF, p. 14; Tr. 743-44, 775, 832). Ms. Stubbs initiated the FBA in April

---

[4]Ms. Nance remained D.G.'s special education teacher at all relevant times and holds a bachelor's degree in elementary and special education and a master's degree in special education. (RFF, p. 9). At the time of the hearing she had twenty-five years of experience in special education. (Tr. 1630).

of 2002 and continued to observe D.G. and gather data for approximately eight (8) weeks. (RFF, p. 14; Tr. 874). The FBA was developed following the typical scientific process of defining the problem gathering information, creating a hypothesis regarding the function of the behavior if possible, and creating interventions. (RFF, p. 15; Tr. 875). Interventions were designed to decrease inappropriate behaviors and increase socially appropriate behaviors. *Id.*; Tr. 875.

## B.     The 2002-2003 School Year.

D.G. attended the District as a sixth grade student through the 2002-2003 school year. (RFF, p. 17). Ms. Nance remained his special education teacher, Christi Foreman ("Ms. Foreman") became his speech-language therapist, and Holly Bozarth replaced Ms. Alexander as his occupational therapist. (RFF, p. 17; Tr. 1733, 1851, 2474, 1879-80). Ms. Alexander, however, continued to participate in D.G.'s IEP reevaluation. (Tr. 3067). Ms. Foreman provided D.G. with 30 minutes per day of speech-language therapy in a one-on-one setting throughout the 2002-2003 and 2003-2004 school years. (RFF, p. 17; Tr. 2478-79, 2484). During that time, D.G. made progress on and mastered many of his speech and language goals and benchmarks. (RFF, p. 17; Tr. 2494-98).

On August 29, 2002, the IEP team convened again to prepare an annual reevaluation plan. (Ex. R-3, pg. 130, 132-33; Tr. 1440, 1729-30). D.G.'s father, William Gray ("Mr. Gray"); Ms. Nance; Rand Hodgson ("Mr. Hodgson"), the parents' advocate; Ms. Stubbs; Ms. Alexander; and Dr. Quick all participated in the meeting. (Ex. R-3, p. 132; RFF, p. 18). During the meeting, the District provided Mr. Gray with notice of its plans to conduct a full reevaluation, and he consented. (RFF, p. 18; Ex. R-3, p. 133; Tr. 1732, 2502-03). On September 10, 2002, Dr. William Breckenridge, an outside licensed psychologist, completed the cognitive and adaptive behavioral components of D.G.'s reevaluation. (RFF, p. 19; Ex. R-3). The IEP team reconvened on October 16, 2002, to

-4-

review and discuss the results of the reevaluation.[5]  (Ex. R-8; Ex. P-36; Tr. 388, 1732-34, 1429-30).

The full report that was prepared incorporated the results of testing done by Ms. Alexander, Dr.

William Breckenridge, and Ms. Nance. (Ex. R-8, p. 201; Tr. 385, 388, 1372, 2499-2500).  It also

incorporated the conclusions from Ms. Stubbs' FBA.  *Id.*  The team concluded that D.G. continued

to require special education and related services based on a diagnosis of educational autism.  (RFF,

p. 20; Ex. R-8, pg. 200-01; Tr. 1734).  Each team member signed in agreement with this conclusion.

(Ex. R-8, p. 201; Tr. 388-89, 1738, 2505-06).

The team reconvened again on November 6 and 14, 2002, to prepare D.G.'s annual IEP.[6]

(RFF, 20; Ex. R-9, p. 205; Ex. P-37).  The IEP that was developed contained a present level of

education section discussing how D.G.'s disability impacted his ability to access the sixth grade

curriculum, progress he made since his prior IEP, his areas of strength, and other facts relating to

him. (RFF, p. 20; Ex. R-9).  The present levels of education section of his IEP also included an

extensive description of his behaviors.[7]  (Ex. R-9, pg. 221-22, 224-25).  The IEP contained goals or

---

[5]Mr. Gray, Mr. Hodgson, Dr. William Breckenridge, Ms. Stubbs, Ms. Nance, Ms.
Foreman, and Dr. Quick participated in this meeting.  (RFF, p. 19; Ex. R-8, p. 201).

[6]Mr. Gray, Mr. Hodgson, Ms. Stubbs, Ms. Nance, Ms. Alexander, Ms. Foreman, and Dr.
Quick were all in attendance.  (Ex. R-9, p. 206).

[7]The following excerpts from D.G.'s 2002-2003 IEP are illustrative:

With regards to the cognitive/behavioral tasks of the academic environment, D[.G.] utilizes
both assistance and adaptations. [He] utilizes moderate assistance for personal care
awareness. [D.G.] utilizes extensive assistance for functional communication, memory and
understanding, following social conventions, compliance with adult directives and school
rules, task behavior/completion, positive interaction, behavior regulation, personal care
awareness, and safety. [D.G.] receives minimal adaptations to functional communication,
memory and understanding, compliance with adult directives and school rules, task
behavior/completion, positive interaction, and safety. [D.G.] receives moderate adaptations
for behavior regulation.

benchmarks for telling time, money skills, measuring, mathematical calculation, reading, writing,

language, work completion, peer interaction, sensory skills, motor skills, and adaptive behavior.

(RFF, p. 21; Ex. R-9, pg. 227-40). While the IEP did not specifically list individualize behavioral

---

In regards to social conventions, [D.G.] demonstrates significant difficulties in this area. He partially performs displaying appropriate behavior regarding issues of sexuality and maintaining appropriate social/physical boundaries by keeping his hands to self or sitting/standing at an appropriate distance. He does not perform eating only his own food/drink unless given permission, smiling/nodding/stating "you're welcome," using good manners, obtaining items that are out of reach appropriately, observing conventions regarding appropriate topics and language, asking permission in contexts where it is expected, respecting others' privacy, apologizing for unintentional mistakes, demonstrating recognition of how and when to communicate about private matters, and observing social conventions regarding asking questions/making statements that are embarrassing or hurtful of others.

[D.G.] demonstrates difficulty proceeding when told to begin, stopping an activity when told to do so, cooperating with non-routine commands and directions, and cooperating when asked to help with cleanup and other classroom chores . . . [D.G.] demonstrates great difficulty with skills required for task behavior and completion . . . [His] interactions with others appear to be limited to those that meet his basic wants and needs. He has difficulty with both peers and adults . . . [He] has difficulty demonstrating restraint with self-stimulatory behaviors, such as hand flapping, jumping up and down, biting his left index finger when stressed/excited, and reciting movies.

(Ex. R-9, pg. 221-22).

\*　\*　\*

[D.G.'s] challenges affect his social skills with adults and peers. At times, [he] interacts with females by saying "toes", and "shoulder". He has been observed touching females in inappropriate places and touching himself in inappropriate places when interacting with certain females.

The staff conducted a functional behavioral assessment. Targeted behaviors were certain words (toes, shoulder, mmm, mother), touching his genitals, and caressing others' shoulders. [D.G.] works exclusively with female teachers, aides and therapists, so there is no data to compare to behaviors with males . . . These behaviors are significant and of concern because of they [sic] way they are perceived by others and because they appear to be ritualistic.

*Id.* at 225.

-6-

goals, it did contain a list of accommodations and modifications, such as a modified spelling curriculum, social stories, visual cues, frequent breaks, immediate and concrete reinforcements, and the use of a private bathroom, that "constituted positive behavioral strategies." (RFF, p. 22; *see also* Ex. R-9, p. 226; Tr. 2515-16, 2518-19). The IEP also included a behavior management plan that was developed based on Ms. Stubbs' FBA, and a sensory diet aimed at decreasing improper behaviors developed by Ms. Alexander. (RFF, p. 22; Ex. R-9, pg. 208-13; Tr. 884, 887, 1766, 1771, 2508, 3080-81). The behavior management plan addressed both distractive behaviors that were perceived as sexual and inappropriate non-sexual behaviors. (Tr. 794-95, 883-90). Under the IEP, D.G.'s placement remained the same. (RFF, p. 22; Tr. 1850).

During the 2002-03 school year, "based on the data collected, [D.G.] made progress on his IEP goals and objectives." (RFF, p. 22). In November of 2002, the District began providing D.G.'s parents with daily behavior sheets that informed them about his behaviors and schedule. *Id.*; *see also* Ex. R-15, R-15A. However, there is conflicting evidence as to whether D.G.'s behavioral problems improved during the 2002-2003 school year. (*See* Tr. 857, 907, 787-88, 796-801). The Panel majority believed that a preponderance of the evidence demonstrated D.G.'s behavioral problems did not improve during this time. (RFF, p. 24, n. 6).

## C. The 2003-2004 School Year.

D.G. attended the District as a seventh grader during the 2003-2004 school year. (RFF, p. 26). On November 11, 2003, his IEP team met to prepare an IEP for the remainder of the 2003-2004 school year.[8] *Id.*; Ex. R-29. Similar to the previous IEPs, the November 2003 plan contained

_____

[8]Dr. Quick; Ms. Nance; Joyce Slayden, D.G.'s physical education teacher; Holly Bozarth; Ms. Foreman; and Ms. Stubbs were in attendance. (Ex. R-29, p. 460). Neither of D.G.'s parents were present. *Id.* The District's witnesses stated that they had made at least two

Case 5:08-cv-06040-GAF   Document 66   Filed 09/11/09   Page 7 of 27

present levels of education and noted the progress D.G. had made over the previous years. (RFF, p. 26; Ex. R-29, pg. 461-66). Again, the IEP contained goals and objectives for telling time, increasing money skills, reading, measuring, writing, staying on task, language, and adaptive, motor, and sensory skills. (Ex. R-29, pg. 475-89). It also contained many accommodations and modification that "constituted positive behavioral strategies to address the student's targeted behaviors." (RFF, p. 26; *see also* Ex. R-29, p. 467; Tr. 1910, 2532-35). Further, the IEP contained a revised behavior intervention plan and a modified sensory diet. (Ex. R-29, pg. 469-74; RFF, p. 26). D.G.'s placement remained unchanged. (RFF, p. 27; Ex. R-29, p. 491).

During the 2003-2004 school year, D.G. "met and/or made some progress with respect to many of the IEP goals and objectives contained in [the] November 2003 IEP." (RFF, p. 27; *see also* Ex. R-35, pg. 509-14; R-38, pg. 521-36; R-50, pg. 633-47). Again, there is a question of whether D.G.'s inappropriate behaviors improved during this time. (RFF, p. 27). The District presented some evidence that progress was made; however, the hearing panel majority discounted this evidence because "the only data kept by the district on those behaviors was for April and May 2004." *Id.*

In March of 2004, D.G.'s parents informed Dr. Quick that a representative of Partners in Behavior Milestones ("PBM"), an organization that trains parents, teachers, and other staff to manage and decrease inappropriate behaviors in children with autism, would be coming to the District to observe D.G.[9] (Ex. P-134; RFF, p. 28). On April 1, 2004, an employee of PBM, Dan

attempts to have them present with no success. (RFF, p. 26).

[9]In May of 2004, PBM began the Milestones school for older children, ages 7-17 ("Milestones"), with autistic challenges. (RFF, p. 30). The school is located approximately forty (40) minutes from Lathrop, Missouri. (Tr. 1093). Corey Royer, the owner of PBM, stated the he

Case 5:08-cv-06040-GAF   Document 66   Filed 09/11/09   Page 8 of 27

Matthews ("Mr. Matthews"), began observations of D.G. at the District. (RFF, p. 28; Ex. P-139, p. 511). Mr. Matthews observed D.G. for approximately five and a half (5 ½) hours, which he stated was a "relatively short amount of time to assess the conduct of any child." (RFF, p. 28; Ex. P-139, p. 511). From his observations, Mr. Matthews created a report that focused only on the behavioral component of D.G.'s school day. (Ex. P-139, p. 511). Mr. Matthews' report stated that most of D.G.'s behaviors appeared to be for avoidance of non-preferred tasks, and that Ms. Nance consistently refused to allow D.G. to avoid such tasks. (Ex. P-139, p. 512). He further noted that Ms. Nance provided a structured academic routine. *Id.* However, he did recommend changes in the program he observed. *Id.* at 513; RFF, p. 29. Mr. Matthews did not testify on behalf of D.G.'s parents; instead, Corey Royer (Mr. Royer"), the owner of PBM, testified on behalf of the parents.[10] (Tr. 1029, 1031). Mr. Royer never met or observed D.G., but based his opinions upon Mr. Matthews' report. (Tr. 1036-38, 1066, 1109; RFF, p. 29). Mr. Royer opined that a behavior plan should change throughout the school year, and that an effective behavior plan should have a dual economy of reinforcement, meaning "one to reinforce the absence of inappropriate behaviors and the other for the production of work." (RFF, 29). Mr. Royer further opined that since D.G.'s IEP behavior plan changed only slightly from 2002 to 2004 and the behavior plan did not employ a dual economy of reinforcement, the District's behavior plan was inappropriate. (Tr. 1074, 1080).

Towards the end of the 2003-2004 school year, D.G.'s parents requested an IEP meeting to

---

believed Milestones would be an appropriate placement for D.G. (Tr. 1079). However, he acknowledged that Milestones was "pretty restrictive" in that D.G.'s opportunity for integration into a normal classroom curriculum and interaction with non-disabled classmates would be severely limited. (Tr. 1130; RFF, p. 30).

[10]Mr. Royer has a bachelor's and master's degree in human development. (Tr. 1030).

Case 5:08-cv-06040-GAF   Document 66   Filed 09/11/09   Page 9 of 27

discuss placement. (Ex. R-47). The request did not state the parent's intention to request PBM as a placement. (RFF, p. 31; Tr. 2331, 2962-63, 2975, 3270). On May 18, 2004, the IEP team, including the parents, met to discuss placement. (Ex. R-48, pg. 623-28; Ex. R-46). During the meeting, Mr. Gray requested the District place D.G. at PBM for the 2004-2005 school year. (RFF, p. 31). At that time, PBM had not yet established Milestones and limited information about PBM was available. *Id.* The team, excluding the parents, concluded Milestones was not the least restrictive environment for D.G. and rejected the request. *Id.*; *see also* Ex. R-48, pg. 625-26; Tr. 2561, 3012, 3272, 3331-32. The parents formally objected to this decision. (Ex. R-48, p. 629).

**D.    Defendant's Due Process Hearing.**

In January 2004, pursuant to § 1415(f) of the IDEA and Mo. Rev. Stat. § 162.961, Mr. Gray requested a due process hearing from the Missouri Department of Elementary and Secondary Education. (Ex. R-42, p. 548). The Grays retained an attorney and, on April 29, 2004, identified the issues for the hearing as follows:

(a)    The District failed to craft an appropriate [sic] drafted IEP for the 2002-03 and 2003-04 school year and, thus, denied [D.G.] a free appropriate public education ("FAPE"):
    (1)    [D.G.'s] IEP lacked sufficiently measurable annual goals and objectives and evaluative criteria;
    (2)    [D.G.'s] IEP lacked adequately related and support services, including an adequate behavior plan.

(b)    The District failed to provide [the Grays] adequate prior written notice for the 2002-03 and 2003-04 school years in violation of 20 U.S.C. § 1415(b) and 34 C.F.R. § 300.503.

(c)    The District failed to provide necessary services for the 2002-03 and 2003-04 school years and failed to provide a FAPE requiring the Grays to obtain such service privately and at their own expense.

(d)    The District failed to address all the student's educational and social emotional needs and thus denied [D.G.] a FAPE for the 2002-03 and 2003-04 school years.

(e)    The District failed to provide special education and related services for the 2002-03 and 2003-04 school years.

-10-

(Ex. R-44).

On May 12, 2004, the Grays' attorney requested the hearing, which was to take place in May of 2004, be continued. (Doc. #1-4, p. ii). An eighteen-day hearing was held in September, October, and December 2004, and March, April, and June 2005. *Id.* at p. ii-iii. The hearing was held before a three-member Panel. *Id.* On or about August 18, 2005, a two-member majority of the Panel issued the Panel's written decision, making the following conclusions in favor of the Grays:

> (a) D.G.'s IEPs for the 2002-03 and 2003-04 [school years] were deficient in that the goals and objectives contained in those IEPs were developed without baseline or starting point data;
> (b) D.G. was denied a [FAPE] during 2002-03 and 2003-04 school years due to the District's failure to adequately address his behaviors in his IEPs;
> (c) The District is incapable of providing D.G. with a [FAPE] due to the animosity that has developed;
> (d) The District failed to address social skills in the 2002-03 and 2003-04 IEPs;
> (e) The District did not make a serious effort to address D.G.'s behaviors during the 2002-03 and 2003-04 school years and failed to prove that D.G. made any progress on behaviors during that time.

(Doc. #1-4). However, the Panel ruled against the Grays on the following issues: (1) that the District failed to give proper notice to the Grays or allow them to participate; and (2) that the Grays were entitled to reimbursement or compensatory damages for private education expenses paid by the Grays. (RFF, p. 55). The Panel issued the following order: "The district shall change [D.G.'s] placement to a full time state approved private educational agency authorized to serve children of [his] age who are diagnosed with autism." (RFF, 56). The Panel reasoned that this remedy was necessary to "provide [D.G.] a free appropriate public education, to provide compensatory education services to [him], and due to the animosity that has developed between the parties and the district's inability to provide [D.G.] a free appropriate public education." *Id.*

-11-

**E.** **Matters Before this Court.**

The District filed suit in this Court, arguing the findings of the Panel and the relief ordered was legally erroneous and not supported by substantial evidence in the record. (Case No. 05-6102-CV-SJ-GAF, Doc. #1-1). Mr. Gray asserted counterclaims against the District; Dr. Quick; Chris Blackburn; and Teri Goldman, legal counsel for Dr. Quick and Chris Blackburn. *Id.*, Doc. #3. In three separate Orders, this Court dismissed all counterclaims against Dr. Quick, Chris Blackburn, Teri Goldman, and the District. *See Id.*, Doc. ##23, 25, 44. On November 8, 2006, this Court denied the District's Motion for Judgment on the Administrative Record and remanded the case to the Panel on the grounds that it wrongly place the burden of proof on the District. *Id.*, Doc. #54.

On March 24, 2008, the Panel issued its Remand Decision. (Doc. #1-5). In a 2-1 decision, the Panel upheld the original decision in its entirety. *Id.* Again, the District filed suit in this Court, arguing that the findings of the Panel and the relief ordered is legally erroneous and not supported by substantial evidence in the record.[11] (Doc. #1). Mr. Gray again asserted the same counterclaims against the District, Dr. Quick, Chris Blackburn, and Teri Goldman. (Amended Answer and Counterclaim, Doc. #7). On September 5, 2008, the counterclaims against Dr. Quick, Chris Blackburn, and Teri Goldman were voluntarily dropped. (Doc. #22). The counterclaims against the District, however, remain.[12] While not entirely clear, it appears that the counterclaims against the District relate to the District's supposed violations of the IDEA for (1) failing to implement the

_____

[11]Any party dissatisfied with decisions rendered in the state administrative proceeding is an aggrieved party under the IDEA and may bring an action in federal court pursuant to 20 U.S.C. § 1415(g).

[12]On March 30, 2009, this Court denied the District's Motion to Dismiss the counterclaims on the grounds that Mr. Gray failed to properly serve it with notice of the claims. (Doc. #29).

-12-

Panel's decision or otherwise comply with the IDEA, (2) claims under 42 U.S.C. §§ 1983 and 1985 on the same grounds, (3) claims under Section 504 of the Rehabilitation Act of 1973 on the same grounds, (4) claims seeking attorney fees, and (5) claims seeking judicial review of those portions of the original hearing panel decision that were decided against Defendant. (Doc. #7).

On May 22, 2009, the District filed its Motion for Judgment on the Pleadings with Respect to the Amended Counterclaim pursuant to Fed. R. Civ. P. 12(b) and (c). (Doc. #47). On the same day, the District also filed its Motion for Summary Judgment or, in the Alternative, for Judgment on the Administrative Record. (Doc. #52). The District argues all counterclaims against it should be dismissed for a number of reasons, such as failure to exhaust administrative remedies, that the IDEA does not allow claims for monetary damages, that punitive damages are not available under Section 504 of the Rehabilitation Act of 1973, the IDEA, or Section 1983, and that the "stay-put" provision of the IDEA does not require them to comply with the Panel's decision until litigation is complete. (Doc. #47). In its Motion for Summary Judgment, the District argues that it is entitled to judgment as a matter of law because the Panel erred in applying the law to the facts of the case and the decision is not supported by substantial evidence. (Doc. #52).

## II. STANDARDS

Under 20 U.S.C. § 1415(i)(2)(B), a court reviewing an appeal of an IDEA claim must (i) "receive the records of the administrative proceedings"; (ii) "hear additional evidence at the request of a party"; and (iii) "grant such relief as the court determines is appropriate," basing its decision on the preponderance of the evidence. While a court reviewing a decision from an administrative panel should give due weight to the results of the due process proceedings under the IDEA, it must nevertheless make an independent determination based on a preponderance of the evidence. *See Bd.*

-13-

*of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *see also D.B. v. Ocean Tp. Bd. of Educ.*, 985 F. Supp. 457, 500 (D.N.J. 1997), *aff'd*, 159 F.3d 1350 (3rd Cir. 1998). The "amount of deference to be afforded the administrative proceedings is an issue left to the discretion of the district court . . . [T]he district court must consider the administrative findings of fact, but is free to accept or reject them." *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1219 (3rd Cir. 1993) (quoting *Jefferson City Bd. of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir. 1988)) (quotations omitted). Under the IDEA, a reviewing court should ordinarily defer to record-supported credibility determinations of hearing panel members, but should exercise plenary review on all other matters, such as inferences from proven facts, conclusions of law, and credibility-based findings that are not adequately supported in the record. *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 527 (3rd Cir. 1995); *see also D.B.*, 985 F. Supp. at 500. Whether a school district has provided a student with a FAPE is "a mixed question of fact and law." *Sch. Bd. of Independent Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1011 (8th Cir. 2006).

Fed. R. Civ. P. 12(c) sets the standard for reviewing a motion for judgment on the pleadings. "A defense of failure to state a claim may be raised in [a motion for judgment on the pleadings] and the same standard is employed as if the motion were brought under Rule 12(b)(6)." *VSA v. Von Weise Gear Co.*, 769 F. Supp. 1080, 1082 (E.D. Mo. 1991) (citing *St. Paul Ramsey County Med. Ctr. v. Pennington County*, 857 F.2d 1185, 1187-88 (8th Cir. 1988)). A Rule 12(c) motion for judgment on the pleadings challenges the legal sufficiency of the opposing party's pleadings. *See Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2nd Cir. 1998). Under the relevant standard, the Court must accept as true all well-pleaded factual allegations contained in the Grays' Counterclaim Complaint. *See Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003).

-14-

However, the Court is not required to give any effect to conclusory allegations of law. *Id.* Judgment on the pleadings is appropriate if, assuming the truth of all material facts pled in the complaint, the moving party is nonetheless entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

Fed. R. Civ. P. 56 addresses motions for summary judgment. Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III.   ANALYSIS

### A.   Sufficiency of the 2002-2003 and 2003-2004 IEPs.

Two members of the Panel held that D.G. was denied a FAPE due to inadequacies in his 2002-2003 and 2003-2004 IEPs and that the District is incapable of providing him with a FAPE in the future. The Panel majority based this holding on two main conclusions of law and fact. First, it concluded that D.G.'s IEPs were deficient because they "were developed without baseline or starting point data." (RFF, p. 42-3). Second, it concluded that the District had failed to adequately address D.G.'s improper behavior in his 2002-2003 and 2003-2004 IEPs. (RFF, p. 54).

A court is not free to add "words or requirements by implication to a statue that is not ambiguous." *McCormack v. Capital Elec. Constr. Co.*, 159 S.W.3d 387, 402 (Mo. Ct. App. 2004); *see also Salinas v. United States*, 522 U.S. 52, 63 (1997). It is difficult, in hindsight, to ascertain exactly how reasonable a student's IEPs were at the time of their adoption given the many paths available but not taken. *See CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 638 (8th Cir. 2003). Because of this difficulty, courts recognize that "[a]s long as a student is benefitting from his

-15-

education, it is up to the educators to determine the appropriate educational methodology." *Id.* (quoting *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 614 (8th Cir. 1997)) (quotations omitted). Specific results are not required. *Id.*; *see also* 20 U.S.C. § 1412. Further, an IEP "need not be designed to maximize a student's potential 'commensurate with the opportunity provided to other children.'" *Id.* at 638-39 (quoting *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 189-90 (1982)). Instead, a school is required only to formulate an IEP tailored to the disabled child's needs that is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07; 20 U.S.C. § 1412.

In this case, the Panel majority erred in its conclusion that D.G.'s IEPs were deficient because they were developed without baseline or starting point data. In its decision, the Panel acknowledges "that the IDEA does not expressly require that such information be contained in an IEP." (RFF, p. 42). Nevertheless, the Panel held that "while Congress did not expressly require that IEPs contain baseline data to support the starting point for each objective or benchmark, without such data there is no way to determine that the student actually made progress." *Id.* The Panel was correct in its assertion that the IDEA does not require this type of baseline or starting point data to be included in an IEP. *See* 20 U.S.C. § 1400, *et seq*. The IDEA mandated only that the IEPs in question contain "a statement of the present levels of educational performance" and "measurable annual goals [and] objectives." 20 U.S.C. § 1414(d)(1)(A)(i), (ii). A preponderance of the evidence demonstrates the 2002-2003 and 2003-2004 school year IEPs met those requirements. Both IEPs contained lengthy statements of D.G.'s present levels of education and set forth numerous measurable annual goals. The Panel was without power to add additional requirements that mandate more detailed information be incorporated into IEPs by implication. *See McCormack*, 159 S.W.3d

-16-

at 402; *see also Salinas*, 522 U.S. at 63. It may be that further requirements would be beneficial, but that determination is left to the province of legislators, not the Panel or this Court. Therefore, D.G. was not denied a FAPE due to a lack of "baseline or starting point data" in his 2002-2003 and 2003-2004 IEPs.

Further, the Panel applied the wrong legal standard when determining that D.G. was denied a FAPE in the 2002-2003 and 2003-2004 school years because the District failed to adequately address his behavior in his IEPs. At numerous points in the decision, the Panel notes D.G. continually made academic progress during the 2002-2003 and 2003-2004 school years.[13] Despite this, two Panel members concluded that the IEPs were deficient because they did not adequately address D.G.'s behavioral problems. The Panel conceded that the IDEA does not require a school district to create goals or objectives for behavior in an IEP, but ultimately determined that D.G.'s "IEP should document in some way that behaviors are being addressed, in goals, a behavior plan, or a statement in the present levels section of the document." (RFF, p. 49, n. 10); *see also Renollett*, 440 F.3d at 1011 (stating federal law does not require a written behavioral intervention plan).

As mentioned above, if a student's IEP is "reasonably calculated to enable the child to receive educational benefits," then the IDEA's IEP requirements have been met. *Rowley*, 458 U.S. at 207; *see also M.M. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 461 (8th Cir. 2008). An IEP "should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or

---

[13]"During the 2002-03 school year and based on the data collected, the student made progress on his IEP goals and objectives." (RFF, p. 22); "During the 2003-04 school year, [D.G.] met and/or made some progress with respect to many of the IEP goals and objectives contained in [the] November 2003 IEP." (RFF, p. 27); "In this case, a majority of the panel finds that [D.G.] made progress in some [academically related] areas." (RFF, p. 45).

-17-

caused a deprivation of education benefits." *Renollett*, 440 F.3d at 1011 (quoting *Indep. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996)) (quotations omitted).

In *CJN*, the Eighth Circuit Court of Appeals reviewed a very similar case. 323 F.3d at 630. There, a disabled student, CJN, also exhibited significant behavioral problems. *CJN*, 323 F.3d at 634. These problems regularly disrupted his education, but CJN nevertheless continued to progress academically. *Id.* CJN's teacher tried to maximize his learning by providing numerous accommodations. *Id.* at 635. CJN also received individualized training from a paraprofessional. *Id.* However, CJN continued to exhibit inappropriate behavior at school, which regularly led to his being given "time-outs" or being physically restrained. *Id.* Eventually, CJN's mother file a complaint seeking, in part, a declaration that CJN was denied a FAPE. *Id.* An independent hearing officer determined that CJN was denied a FAPE, mainly because of "a lack of sufficient positive behavioral interventions." *CJN*, 323 F.3d at 635. On appeal, a state hearing officer reversed, and a district court affirmed. *Id.* CJN's parents then appealed to the Eighth Circuit. *Id.* at 635-36.

The court upheld the district court's decision. *Id.* at 638. The court noted that CJN's steady academic progress despite his sever behavioral problems was evidence that the school district had at least made a good faith effort to address his behavioral problems. *Id.* Academic progress is not dispositive of the issue, but is, as the United Supreme Court stated, "an 'important factor' in ascertaining whether a disable student's IEP was reasonably calculated to provide educational benefit." *Id.* (citing *Rowley*, 458 U.S. at 202). The court further reasoned that CJN's contentions that his behavioral problems were severe made "his academic progress even more relevant to the educational benefit inquiry, because it demonstrates that his IEPs were not only reasonably calculated to provide educational benefit, but, at least in part, did so as well." *Id.* The court found

-18-

the school district had made a good faith effort to minimize CJN's improper behaviors. *Id.* at 639.

It further held that because CJN was benefitting from his education, deference should be given to

the school's judgment regarding the appropriate educational methodology. *Id.* at 638 (citing *Fort*

*Zumwalt*, 119 F.3d at 614). While more positive behavioral interventions might have been

employed, "that fact is largely irrelevant." *Id.* at 639. The court concluded by saying:

> Of course, we wish that CJN had made more behavioral progress, but the IDEA does
> not require that schools attempt to maximize a child's potential, or, as a matter of
> fact, guarantee that the student actually make any progress at all. It requires only
> that the student be provided with an IEP that is reasonably calculated to provide
> educational benefit and we conclude that that happened here.

*Id.* at 642.

In a case decided prior to *CJN*, the Eighth Circuit did find a school district's failure to

address a disabled student's behavioral problems in his IEP denied a FAPE. *Neosho R-V Sch. Dist.*

*v. Clark*, 315 F.3d 1022 (8th Cir. 2003). In that case, there was a strong inference the student had

not progressed academically. *Id.* Some evidence seemed to show "some slight academic progress,"

but this evidence was contradicted by other evidence. *Clark*, 315 F.3d at 1029. Further, the school

district had placed a requirement in the student's IEP that it create a behavioral intervention plan and

incorporate the plan into his IEP, but then fail to do so. *Id.* at 1027. Thus, while the IDEA did not

require the creation or adoption of a behavioral intervention plan, the school district had breached

its self-imposed obligation to do so. The above facts led the court to find the school district's IEP

was not reasonably calculated to provide a FAPE. *Id.* at 1030.

In a final case, the United States District Court for the District of Minnesota held a school

district had denied a disabled student a FAPE because of its failure to adequately address the

-19-

student's behavioral problems in his IEP. *Larson v. Indep. Sch. Dist. No. 361*, No. Civ. 02-3611, 2004 WL 432218 (D. Minn. March 2, 2004). That case involved a disabled student who suffered from an emotional behavior disorder falling within the IDEA. *Larson*, at *1. The sole purpose of his special education was to correct his behavioral problems, which were very extensive and resulted in more than thirty-one (31) disciplinary violation, including a violation involving a physical altercation with another student. *Id.* The school district never conducted a FBA or developed and included a behavior intervention plan addressing his behaviors in his IEP. *Id.* at *10. Because the student's behavior problems were the sole focus of his IEP and the school district failed to conduct a FBA or develop and include a behavior intervention plan in his IEP, the court held the student was denied a FAPE. *Id.*

In this case, the Panel relied heavily on *Larson* and *Clark* in an attempt to distinguish this case from *CJN*. However, the facts in this case, as decided and stated in the Panel's decision, stand in sharp contrast to those in *Larson* and *Clark*. For example, in *Larson* (1) the sole purpose of the student's IEP was to curtail improper and disruptive behavior; (2) the school district failed to conduct a FBA of the student's behavior problems; and (3) the school district failed to create or incorporate any type of behavior intervention plan into his IEP. In this case, (1) the purpose of D.G.'s IEP was not only to limit his problematic behaviors, but also to ensure that he progressed academically; (2) the District hired Mr. Stubbs to conduct a FBA, which was incorporated into D.G.'s relevant IEPs; and (3) both the 2002-2003 and 2003-2004 school year IEPs contained a behavioral plan. In *Clark*, at all levels of the administrative process, it was determined that the student had made no meaningful academic progress under the school district's IEP and that even though the school district had required the student's IEP contain a behavioral plan, no plan was ever

-20-

created or implemented. Here, the Panel explicitly found that D.G. did progress academically under the IEPs in question, and both IEPs contained a behavior plan in addition to numerous accommodations and modifications that "constituted positive behavioral strategies." (RFF, p. 22).

Given the facts of this case, *CJN* controls its disposition. Like the student in *CJN*, D.G. made academic progress under the IEPs at issue, implying that his IEP was "managing his behavioral problems in a way that allowed him to learn." *See CJN*, 323 F.3d at 638. Defendant's argument that D.G.'s behavioral problems were severe, thus requiring extra attention by the District, only increases the relevance of D.G.'s academic progress, because "it demonstrates that his IEPs were not only reasonably calculated to provide educational benefit, but, at least in part, did so as well." *See Id.*

These findings alone justify a determination that D.G.'s IEPs complied with the IDEA's IEP requirements. The facts in this case, however, further demonstrate the District made a good faith effort to ensure D.G. received a FAPE. For instance, the District enrolled its special educators in training related to the education of autistic children as soon as it discovered D.G. would attend. It hired occupational therapists to provide individualized services to D.G. It provided him with daily one-on-one speech-language therapy by Ms. Foreman, and gave him access to various other para-professionals. The District also hired an expert consultant to assess some of D.G.'s behavioral problems and offer advice. Additionally, both the 2002-2003 and 2003-2004 school year IEPs were detailed and contained lengthy statements regarding D.G.'s behavioral issues as well as ideas for overcoming them. The 2002-2003 IEP also includes the independent cognitive and adaptive behavioral evaluation of Dr. William Breckenridge, and the results of additional testing conducted by Ms. Alexander and Ms. Nance. These facts demonstrate the District took steps to ensure D.G.'s

IEPs complied with the IDEA above and beyond even those of the school district in *CJN*.

It might be that there were other, possibly more effective, methods the District could have adopted in its behavioral plans to control D.G.'s behavior, but that fact is "largely irrelevant" because he was benefitting from his education and, therefore, "deference should be given to the [District's] judgment regarding the appropriate educational methodology." *CJN*, 323 F.3d at 639. The Panel erred in determining that D.G. "[w]as denied a [FAPE] during 2002-03 and 2003-04 school years due to the District's failure to adequately address his behaviors in his IEPs" and that the District "did not make a serious effort to address D.G.'s behaviors during the 2002-03 and 2003-04 school years." Likewise, the Panel's decision that the District "failed to address social skills in the 2002-03 and 2003-04 IEPs" is unsupported by law and the evidence presented.

**B.   D.G.'s Placement**

As mentioned above, the Panel ordered the District to change D.G.'s placement to a full-time state approved agency specializing in autism. The Panel majority's main reason for ordering this relief was its belief that "[t]he District is incapable of providing D.G. with a FAPE due to the animosity that has developed" between the parties. This determination cannot stand for a number of reasons. First, having found the District's IEPs complied with the requirements of IDEA, there is no violation and no need for a remedy. However, even assuming, *arguendo*, the District did somehow deny D.G. a FAPE, this remedy is improper. Nothing in the record supports the broad statement that animosity between the parties is so great that the District is incapable of providing D.G. a FAPE. Given the duration of this litigation and the subject matter it incorporates, it is not unreasonable to believe that some amount of animosity now exists between the parties. However, the evidence does not demonstrate the parties lack the ability to cooperate in a manner that will

-22-

ensure D.G. continues to receive the education he deserves. The Panel's findings of fact offer proof of this. In its decision, the Panel describes how the relationship between D.G.'s parents and the District "became very strained" during the 2002-2003 and 2003-2004 school years. (RFF, p. 25). However, it then states, "The panel will note that the parties were able to conduct themselves appropriately during 18 days of hearing, which was held at a neutral location." *Id.* at 25-26. Later in the decision, the Panel recognizes that in May 2004 Mr. Gray and the rest of D.G.'s IEP team were able to meet at a neutral location to discuss D.G.'s placement, and "the meeting was civil." *Id.* at 31. The record also supports this conclusion.[14] These findings strongly contradict the Panel's conclusion that the District could not offer D.G. a FAPE because of animosity between the parties. The remedy is not supported by a preponderance of the evidence and, thus, cannot stand.

## C.      Counterclaims against the District

In his Claims for Relief, Defendant asserts counterclaims against the District arising from the District's refusal to implement the Panel decision under the IDEA, under 42 U.S.C. §§ 1983 and 1985, and under Section 504 of the Rehabilitation Act of 1973. Defendant also alleges the District violated Section 504 of the Rehabilitation Act of 1973 by failing to afford him an opportunity to participate in D.G.'s IEP meetings. Additionally, Defendant requests compensatory and punitive damages, as well as attorney fees, for the aforementioned alleged claims under the IDEA, 42 U.S.C §§ 1983 and 1985, and Section 504 of the Rehabilitation Act of 1973. Lastly, Defendant requests the Court to overturn those portions of the decision favorable to the District. The District has requested these claims be dismissed.

_____

[14]When questioned, Ms. Nance stated this meeting was "[c]ivil" and "[c]ordial." (Tr. 1988). She further described previous meetings between the parties as "congenial." *Id.*

-23-

### i. The First, Second, Third, Fourth, Fifth, and Seventh Claims for Relief

Defendant's First, Second, Third, Fourth, Fifth, and Seventh Claims for Relief are all based on his belief that the District was obligated to immediately adopt and comply with the Panel's decision. The "stay put" provision of the IDEA, 20 U.S.C. § 1415(j), however, negates these claims.

Section 1415(j), in relevant part, states:

> [D]uring the pendency of any proceeding conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child, . . . until all such proceedings have been completed.

Thus, the IDEA requires a child remain in the placement specified in the last mutually agreed upon IEP until the entire dispute is resolved or the parties agree to change placement. *See Cosgrove v. Bd. of Educ. of the Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 383 (N.D.N.Y. 2001).

Defendant cites no law to support the argument that D.G. was entitled to have the Panel's decision immediately enforced. The District cannot be said to have violated D.G.'s rights by adhering to § 1415(j)'s command, and nothing indicates the District has acted in bad faith regarding D.G.'s continued placement following the Panel's decision. To the extent that any of these counterclaims assert claims for relief on grounds of the District's failure to implement the Panel's decision, they are **DISMISSED**.[15]

---

[15]The § 1983 and § 504 claims are also improper an alternative grounds. These claims are merely an attempt to recast the IDEA claims as claims arising under other law. Courts have not allowed such claims. *See Larson*, 2004 WL 432218, at *16 (dismissing a claim alleging equal protection violation under § 1983 that arose from an alleged denial of FAPE); *see also Lunceford v. Dist. of Columbia Bd. of Educ.*, 745 F.2d 1577, 1580 (D.C. Cir. 1984); *Monahan v. Nebraska*, 687 F.3d 1164, 1170 (8th Cir. 1982) (holding that more is required to state a claim under § 504 of the Rehabilitation Act of 1973 than an allegation of a denial of a FAPE).

Case 5:08-cv-06040-GAF   Document 66   Filed 09/11/09   Page 24 of 27

Regarding any allegations of conspiracy under 42 U.S.C. § 1985, Defendant has failed to plead any facts demonstrating a plausible claim that the District somehow conspired against him or his family. Defendant instead pleads only conclusory statements of conspiracy. The Court is not required to and does not accept such allegations as true. *See Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949 (2009). Accordingly, Defendant's claims of conspiracy against the District are **DISMISSED** for failure to state a claim.

### ii. The Sixth Claim for Relief

Defendant's Sixth Claim for Relief alleges that the District violated Section 504 of the Rehabilitation Act of 1973 by failing to afford Mr. Gray an opportunity to participate in D.G.'s IEP meetings. To plead a case of disability discrimination under § 504, a party must demonstrate that he: (1) "is a qualified individual with a disability; (2) was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) was discriminated against based on [his] disability." *Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971 (8th Cir. 1999). Here, Defendant has pled no facts proving that either Mr. Gray or his wife is or was a "qualified individual with a disability." *See id.* Thus, Defendant has failed to state a claim for relief under § 504 of the Rehabilitation Act of 1973, and such claims are **DISMISSED**.

### iii. Claims for Attorney Fees, Compensatory Damages, and Punitive Damages

Defendant requests the Court award attorney fees, compensatory damage, and punitive damages for violation of the IDEA, 42 U.S.C. §§ 1983 and 1985, and § 504 of the Rehabilitation Act of 1973. Because it has been determined that the Panel erred in its decision that the District's IEPs denied D.G. a FAPE, Defendant is no longer a "the prevailing party" under 20 U.S.C. § 1415(i)(3)(B), and the Court is without authority to award attorney fees. Further, having dismissed

Mr. Gray's claims under 42 U.S.C. §§ 1983 and 1985 and § 504 of the Rehabilitation Act of 1973, neither compensatory or punitive damages for those claims are appropriate.[16]  Accordingly, the Claims for Relief requesting attorney fees, compensatory damages, and punitive damages are **DISMISSED**.

> ### iv.    Claims requesting the Court to overturn the Panel's decision.

It is unclear whether Defendant actually intended to seek relief from the adverse portions of the Panel's decision in his counterclaim.  However, in his Eighth Claim for Relief, Defendant states:

> The Parents believe the Panel did not go far enough in recognizing the claims the Parents presented.  This is particularly true of the defective nature of the IEPs and the failure to recognize the denial of the Parents [sic] right to participate as equal partners in the IEP.

(Doc. #6).  Further, in his Prayer for Relief, he requests the Court to declare the "Panel should have recognized additional claims brought by the Parents as meritorious." *Id.*  The District raised this issue in its Motion for Summary Judgment or, in the Alternative, for Judgment on the Administrative Record, and the parties had an opportunity to brief the matter.

After review of the record, the Panel's findings of fact, and relevant case law, the Court concludes that the Panel did not err in its determination that the District did not violate the Grays' participation right or that the Grays were not entitled to compensatory damages for private education.  The Panel's decision on these issues was well supported by the evidence and consistent

---

[16]The Court notes that notwithstanding its dismissal of these claims, it would still lack authority to award most of the damages requested.  *See Heideman v. Rother*, 84 F.3d 1021, 1033 (8th Cir. 1996) (holding parents cannot state a claim for monetary damages under the IDEA); *see also Barnes v. Gorman*, 536 U.S. 181, 190 (2002) (holding punitive damages not available under Section 504); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 471 (1981) (holding punitive damages not allowed against municipalities under § 1983).

Case 5:08-cv-06040-GAF   Document 66   Filed 09/11/09   Page 26 of 27

with relevant law. Therefore, the Court will not disturb those portions of the decision, and any requests by Defendant to overturn them are **DISMISSED**.[17]

## **CONCLUSION**

For the reasons set forth above, the District's present Motions are **GRANTED**. Accordingly, Defendant's counterclaims are **DISMISSED**, and the case is remanded to the Panel for entry of a decision in conformity with this Order.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

DATED:   September 11, 2009

---

[17]Defendant's counterclaims are not the model of clarity. The Court has attempted to address each counterclaim apparently made. However, if the Court has overlooked any additional claims for relief Defendant intended to include in his counterclaim, they are hereby **DISMISSED** for failure to state a proper claim for relief.

Case 5:08-cv-06040-GAF   Document 66   Filed 09/11/09   Page 27 of 27